Claremont District Court
No. 82-557

DAVID J. MCBRIDE & a.

v.

ROBERT ORR

October 5, 1983

*Decato & Cirone P.A.*, of Lebanon (*R. Peter Decato* on the brief), by brief for the plaintiffs.

*Buckley & Zopf*, of Claremont (*Robert B. Buckley, Jr.*, on the brief), by brief for the defendant.

BATCHELDER, J.   The question presented in this appeal is whether the authority vested in certain law enforcement officers by RSA 466:36 to "kill any dog found in the act of maiming or in close pursuit of deer, moose, caribou, sheep, cattle, swine or poultry" may be exercised after the fact or only while the dog is in the act of maiming or in "close pursuit." We hold that the statute applies only while the act of maiming or close pursuit is taking place.

This case was tried in the Claremont District Court (*Leahy*, J.) upon a small claim action brought by the plaintiffs David J. and Maren McBride against defendant Robert Orr, the Plainfield dog officer, for damages to the plaintiffs' property resulting from the killing of their dog by the defendant. The defendant claimed immunity from liability pursuant to that part of RSA 466:36 which provides that "[n]o civil action for recovery of damages shall lie against any conservation officer, state police officer, or dog constable while acting under authority granted herein."

There being no transcript of the testimony before the district court, we adopt the court's factual findings as contained in its order of November 11, 1982:

> "On April 16, 1982, the defendant, who is the dog constable of the town of Plainfield, observed a dog which resembled one owned by the plaintiffs in pursuit of deer. Several minutes later and some distance from the point where the original pursuit occurred the defendant shot the plaintiffs' dog."

The trial court found for the defendant. For the reasons which follow, we reverse and remand for the assessment of the plaintiffs' damages.

The provisions of RSA chapter 466 contain the contemporary legislative response to society's concerns for the ownership and main-

tenance of dogs, including their licensing, deeds, and misdeeds. One part of the statute deals with the relationship of dogs to wild game and domestic animals and with the sanctions imposed for violations of the prescribed conduct, both by dogs and by their owners.

■ This court long ago recognized a balancing test based upon immediacy and consequences in determining when and under what circumstances such drastic and unequivocal action as killing an animal in which someone had a property interest might be justified in law. *Aldrich v. Wright*, 53 N.H. 398 (1873). Although the opinion by Judge Doe dealt with a case of minks pursuing geese, it touches upon many predatory parallels, such as hogs pursuing chickens, dogs pursuing sheep, dogs worrying fowl, dogs pursuing conies in a warren, and a mastiff killing another dog. The case stands generally for the proposition that defensive force is measured, in its kind, degree and promptness, by the consequences of using it and the consequences of not using it. *Id.* at 402.

It is apparent that our legislature had such a balancing test in mind when it incorporated in RSA 466:36 the language: "found in the act of maiming or in close pursuit . . . ." The immediacy of such circumstances in the eyes of the legislature would justify the ultimate enforcement measure, *i.e.*, summarily killing the dog found committing such an act.

■■ It is reasonable to place a strict interpretation on the statute, because a narrow grant of authority in the appropriate official ensures that the statute is utilized solely to prevent impending harm to animals and not in retribution to dispatch summarily the offending animal after the fact. Also, if an officer acts at a later time, as was done in this case, the accurate identification of the dog may be problematical. As the trial judge pointed out: "[T]he defendant . . . observed a dog which *resembled* one owned by the plaintiffs . . . ." (Emphasis added.) This lack of certainty is obviated by giving the appropriate officer the power to kill only while the dog is actually maiming or closely pursuing the animal.

Our narrow reading of the statute also finds support in English common law. *See Janson v. Brown*, 1 Campb. 41 (cited in Christian, *A Treatise On The Game Laws: In Which It is Fully Proved That, Except In Particular Cases, Game Is Now, And Has Always Been, By The Law Of England, The Property Of The Occupier Of The Land Upon Which It Is Found And Taken. With Alterations Suggested For The Improvement Of The System 263* (1817)). Christian reports that in *Janson* Lord Ellenborough ruled that the defendant was not justified in killing the plaintiff's dog which had been worrying the

defendant's fowl, as the dog had dropped the fowl from its mouth "above an instant when the piece was fired." *Id.*

The legislature has provided an alternative method for dealing with dogs annoying game by the provision of criminal sanctions upon the owners of such dogs. These provisions are contained in RSA 466:33 and :34 and deal with those occasions where the offending dog is not actually in the act of maiming or pursuing but has been discovered pursuing or harassing the protected game in the past or is running at large in territory inhabited by "game birds or quadrupeds."

The liberal interpretation of the statute which the trial court would urge upon us is too broad and provides too great an opportunity for the exercise of administrative excesses and zeal.

*Reversed and remanded.*

SOUTER, J., did not sit; the others concurred.